BEASLEY, STATE COMPTROLLER *v.* DAILEY.

5-125                                   260 S. W. 2d 442

Opinion delivered June 22, 1953.

Rehearing denied October 5, 1953.

*Tom Gentry,* Attorney General, and *John R. Thompson,* Assistant Attorney General, and *Ed F. Ashbaugh,* for appellant.

*Carl Langston,* for appellee.

GRIFFIN SMITH, Chief Justice. Dalton Dailey, doing business as Dailey's United Supply Company, sought to prevent the treasurer of state from paying warrants amounting to slightly more than $12,500. Vouchers had been issued by the State Game and Fish Commission in payment of bills for furniture installed in the commission's new building in 1952. The state comptroller was made a defendant and the game and fish commission intervened.

Dailey's complaint asserts that Beasley was officially derelict in delegating to the commission authority expressly vested in the comptroller; that the commission and the comptroller did not comply with mandatory provisions of Act 214 of 1943, and that as a taxpayer the suit was public in its nature, the intention being to prevent an illegal exaction. A temporary order restraining payment of warrants issued to Dailey's competitors was made permanent by the special chancellor. This appeal tests the correctness of that order.

Section 4 of Act 214 is entitled: "Pre-Authorization of Expenditures." Where the estimate is that purchases will exceed $500 sealed bids are required. Published notice is given. If prospective bidders are known, the state agency or department to which the Act is applicable must send information by mail announcing that on a day certain bids will be considered. A slightly different procedure applies to purchases when it is contemplated that $500 or less will be involved.

Language of the Act is that contracts shall be awarded to the lowest responsible bidder, "taking into consideration conformity with the specifications, terms of delivery, and other conditions imposed in the call for

bids." The agency or department receiving bids shall submit them to the comptroller, *"and he shall have the power to decide as to the lowest responsible bidder as to all purchases".*

The request for bids is dated February 13, 1952. Responses were receivable until the morning of February 21 at 10 o'clock, "the nomenclature and specifications [of the furniture desired] being specifically described". See footnote for copy of advertisement.[1] The publication closes with the comment that the furniture must be of first class quality, material, and workmanship, with guaranteed delivery March 15th. The department reserved the right to reject any or all bids.

The comptroller testified that the commission's needs were certified to him, that he authorized publication of the advertisement, and furthermore that he approved the rejection of Dailey's bids and ordered that other bids be accepted. Dailey contends that in the aggregate $1,500 in excess of his bids went to the suppliers whose offers were accepted—or would go to them if the warrants are paid. But the comptroller also testified that when Dailey's bids were received just a few minutes before the "dead line" in point of time, insufficient information was given. In some instances sizes and descriptions varied from furnishings upon which bids had been requested. Dailey was not present and could not be questioned for explanatory purposes when the bids were opened, nor was he represented.

*Item No. 1.*—(executive walnut desks)—called for bids on three units 68 to 72 inches. Dailey offered three

---

[1] (1)—Three executive walnut desks, size 68 to 72 inches; (2)—One walnut table, 34 x 68 inches; (3)—Two walnut drop-head secretarial desks, 58 to 68 inches; (4)—One walnut directors' table, 32 x 48 inches; (5)—Three walnut telephone cabinets; (6)—One 5-ft. walnut reception bench; (7)—Three leather upholstered walnut revolving side arm chairs; (8)—Fourteen leather upholstered side arm chairs; (9)—One walnut revolving side arm chair; (10)—Three leather upholstered secretarial posture chairs; (11)—Twelve walnut arm chairs; (12)—150 plastic upholstered theatre type seats, installed; (13)—Five gray steel executive desks, 68 to 72 inches; (14)—Two gray steel drop head secretarial desks; (15)—One gray steel side panel secretarial desk; (16)—Six gray steel side arm upholstered revolving chairs; (17)—Six gray steel side arm chairs; (18)—Three gray steel upholstered secretarial posture chairs; (19)—Twelve 4-drawer gray steel letter files.

desks 78 x 36 inches, the length being six inches in excess of the maximum requested by the commission. In the circumstances, however, this would not be controlling. The Democrat Printing & Lithographing Company's bid of $350 (less 15%) was accepted in purchasing one desk 68 x 36 inches—the exact length specified in the advertisement. Two other desks were purchased from Parkin Printing & Stationery Company for $212.50 each. These were 66 x 36 inches—two inches short of specifications.

*Item No. 3.*—The specifications were for two walnut drop-head secretarial desks, 58 to 68 inches. Dailey's bid was $350 for "Walnut typewriter desks." Size and description were absent. The commission accepted the bid of Parkin Printing Company for "Two Leopold 60 x 34 drophead typewriter desks, genuine walnut, at $187 each."

*Item No. 5.*—Where the advertisement called for three walnut telephone "cabinets," Dailey's proposal mentioned telephone "stands."

*Item No. 6.*—The comptroller's construction was that this bid on a 5-ft. walnut reception bench failed to show the kind of material offered. In this we think the comptroller was in error, since the caption of Dailey's bids was, "All items first class quality and wood items are of solid walnut construction." The award went to Parkin at $178.90 when Dailey's bid was $105.

*Item No. 12.*—The advertisement was for 150 plastic upholstered theatre-type seats, installed. Dailey did not bid on this lot because he was unable to make delivery.

Only a few of the many items discussed by the comptroller will be mentioned, although testimony covered the entire range. It is to be doubted that any but the litigants—and they have the information—would be interested in a recapitulation of all bids and the comptroller's reasons for rejecting Dailey's offers and in most instances accepting quotations substantially higher in point of price.

The question is whether the intention of Act 214 was to compel the comptroller to look to figures alone in ap-

proving bids for merchandise like furniture. Every informed person knows that walnut, mahogany, and other veneers are sold as "solid," and that the responsibility of the seller and his connection with manufacturers whose products have been proven are essentials, on a parity with price. A so-called "walnut desk 36 x 78" may be worth $100 or $1,000, depending entirely upon its construction and finish. The same rule applies to every item the commission proposed to buy. Secretary McAmis went, as the law directs, to the comptroller, and that official sanctioned the methods by which bids were received; and the comptroller gave his unqualified approval to purchases and rejections. Was this error of a kind invalidating the contracts? We do not think that it was.

In the first place an expensive building, reflecting credit upon the state and upon the commission, was to be furnished. Certainly those who were in charge of the commission's activities had a right to some explanation regarding the quality of more than twelve thousand dollars worth of permanent furnishings. It is in evidence that no descriptive literature accompanied Dailey's bid. At least one witness testified that he undertook to inspect the offerings, but was not successful. Perhaps this effort was not aggressively followed up, but the protruding fact is that the comptroller supervised the transaction, that he exercised what appeared to him to be a discretionary right to say who was the lowest responsible bidder, and that in rejecting Dailey's offer and approving the bids of D. P. & L., of Parkin, and of All State Supply Co., he took into consideration detailed descriptions, photographs of various items, quality of the merchandise, and relied upon personal inspections made by those to whom the duty of ascertaining facts not shown in Dailey's bids had been delegated. It is inconceivable that the lawmakers, in approving Act 214, expected an individual who was already burdened with as many duties as anyone could possibly discharge, to personally supervise the matters at issue.

It is our view that the statutory expression "lowest responsible bidder" was intended to permit the comptrol-

ler to disregard price in favor of intrinsic values where, in his judgment, the merchandise offered at a lower figure was not comparable to the higher quality found in the article needed. The exhibits attached to or supplied concurrently with the prevailing bids are persuasive of the proposition that the commission and the comptroller took a realistic view of the transactions and completed the purchases without violating the legislative concept, hence the decree must be reversed. It is so ordered.

Justice MILLWEE not participating.

GEORGE ROSE SMITH, J., (dissenting). I do not contend that Dailey is entitled to complain because his own bids were rejected, but I agree with the chancellor in thinking that these purchases were not made in compliance with the law and that Dailey as a taxpayer should have an injunction. Since the majority have deemed it unnecessary even to state the facts that I regard as controlling it is necessary for me to summarize some of the evidence.

McAmis, executive secretary of the Fish & Game Commission, testified that in advertising for bids the Commission purposely avoided exact sizes and specifications, so that the commissioners would have a wider range of selection. In addition to this intentionally vague invitation to bidders, the prospective sellers were notified by telephone that their bids need not conform exactly to the specifications as advertised. A representative of one of the successful bidders testified that he understood all along that it was a customer's selection type of bid and that his part in the transaction would be a job of salesmanship.

When the bids were opened all the sellers except Dailey had salesmen present. The salesmen submitted samples of their wares and literature concerning the furniture offered for sale. Representatives of the Commission then went on a shopping tour and selected whatever items they thought would be suitable for the new building, *regardless of price*. Purchases were made from three different concerns, but in several instances

the bid that was accepted was higher than a competing bid made by another one of these same three companies. Obviously in such cases the rejected bid not only was lower but also was admittedly made by a responsible merchant. The representatives of the Commission merely thought that the more costly article would better suit the new building.

To call this procedure competitive bidding is simply a misuse of the English language. The advertisement for sealed bids accomplished nothing except to inform furniture dealers that the Commission was in the market for some merchandise. The statute (Ark. Stats. 1947, § 13-304) requires that the specifications be advertised, that sealed bids be submitted, and that the purchase be made from the lowest responsible bidder. Here neither the specifications nor the sealed bids served the slightest purpose, *nor were they intended to*. They were empty gestures, devoid of all the significance that the statute meant for them to have. If this method of doing business satisfies the statutory requirement that bidding be competitive, the legislature has wasted its time in enacting the law. Even with some safeguards the State's purchasing system has been subjected to abuse, but I see no limit either to the favoritism or to the waste of public funds that is made possible by the court's approval of these contracts.